UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRAIG A. BEAUBIEN, *et al.*,

        Plaintiff,

                                         Case No.: 21-11000

v.                                      Honorable Gershwin A. Drain

CHARU TRIVEDI, M.D., *et al.*,

        Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [#40] AND AMENDING DATES

### I.      INTRODUCTION

Plaintiffs Craig Beaubien, and his wife Whitney Beaubien, filed this medical malpractice action on May 3, 2021.  Plaintiffs allege Defendant Charu Trivedi, M.D., a board-certified hematologist, and oncologist, breached the standard of care by failing to recognize the blood condition, polycythemia, she was treating the Plaintiff Craig Beaubien for could have been secondary to renal cell carcinoma (RCC).  Plaintiffs further allege a seven-month delay in diagnosis caused Plaintiff Craig Beaubien to suffer physical pain, mental distress and anguish, loss of earnings and a reduced life expectancy.

Presently before the Court is the Defendants, Dr. Trivedi's, and the Toledo Clinic, Inc. d/b/a Toledo Clinic Cancer Centers' Motion for Summary Judgment, filed on October 21, 2022.  Defendants assert Plaintiffs' medical malpractice claim is not actionable because Michigan does not allow a living plaintiff to recover for decreased odds of survival pursuant to the Michigan Supreme Court's decision in *Wickens v. Oakwood Healthcare Sys.*, 465 Mich. 53, 62; 63 N.W.2d 686 (2001). Defendants maintain they are therefore entitled to summary judgment.

Plaintiffs filed a Response on November 13, 2022, and Defendants filed their Reply on November 23, 2022.  A hearing was held on March 10, 2023.  For the reasons that follow, Defendants' Motion for Summary Judgment is granted in part and denied in part.

## II.    FACTUAL BACKGROUND

On November 27, 2018, Plaintiff Craig Beaubien began care with Dr. Trivedi for polycythemia after blood tests ordered by his primary care physician revealed Plaintiff's hematocrit (HCT), the proportion of red blood cells in the blood, was abnormally high at 53.3.  Dr. Trivedi did not take any imaging studies to determine the cause of Plaintiff's high HCT.  Her impression was Plaintiff's polycythemia was secondary to smoking, dehydration, and sleep apnea.  Dr. Trivedi ordered lab work and a test to rule out primary polycythemia.  She suggested increased fluids, weight loss, smoking cessation and continued CPAP

usage.  She planned a phlebotomy if Plaintiff's HCT was above 50 at follow up.
On December 13, 2018, Dr. Trivedi ordered a phlebotomy because Plaintiff's HCT
remained above 50.  She ordered another phlebotomy in February of 2019.

On June 23, 2019, Plaintiff went to Promedica Monroe Regional Hospital
with complaints of severe headache lasting a week, slight visual/depth perception
disturbance; mild left-sided weakness and nausea without vomiting.  A CT scan
and MRI revealed an 8.3 centimeter tumor in Plaintiff's kidney with metastasis to
the brain, and multiple bilateral lung nodules.  He was transferred to the University
of Michigan Hospital on the same day and underwent a lung biopsy, which
confirmed metastatic renal cell carcinoma to the lungs and brain.

On July 11, 2019, Plaintiff was seen by oncologist Bruce Redman, D.O.,
who explained metastatic RCC is not curable and that treatment would be
palliative with the goal of prolonged time and quality of life.  Treatment consisted
of three modalities: (1) stereotactic radiotherapy to address the brain tumor; (2)
targeted chemotherapy to attack the cancer directly; and (3) new immunotherapy
treatment intended to trigger the body to mount an immune response to cancer.  All
of this was followed by surgery to resect the remains of the brain tumor.

Nearly forty months after his diagnosis of metastatic RCC to the brain,
kidney and lungs, Plaintiff has had no recurrence of brain metastasis, however in

June of 2021, he was diagnosed with liver metastasis, which continues to progress despite treatment.

Plaintiff's expert, Dr. Russell K. Pachynski, M.D., a board certified oncologist, reviewed Plaintiff's medical records from Dr. Trivedi, the Monroe Regional Hospital and the University of Michigan Hospital, and drafted a report. In his report, Dr. Pachynski concludes it is "a virtual certainty that the primary tumor in the kidney was detectable with appropriate imaging[,]" such as ultrasound, CT scan or an MRI, if done in November of 2018 when Plaintiff first began treating with Dr. Trivedi and the Toledo Clinic. ECF No. 40, PageID.388.  In reaching his conclusion, Dr. Pachynski relied on the fact that in June of 2019, the renal tumor was 8.3 centimeters and had progressed to stage IV with lung and brain metastases. *Id*.  He further explained:

> "Patients with more advanced disease (i.e. more metastatic tumor burden) typically have lived with their cancer for longer periods of time, as cancer – on average – tends to grow in an exponential manner in humans.  Thus, it follows that a delay in diagnosis and treatment would result in more advanced disease, and thus lowered overall survival.

*Id*., PageID.386.  However, Dr. Pachynski could not opine on the size of the kidney tumor in November of 2018 and cannot isolate when or where it first spread.  *Id*. at PageID.411.

Dr. Pachynski further concluded that it is probable that the brain metastasis developed during the seven months Plaintiff's RCC remained undiagnosed and

4

untreated. *Id*. at PageID.387.  Relying on peer reviewed studies, Dr. Pachynski

concluded that for patients with brain metastasis at the time of RCC diagnosis,

only 50% were alive at 12 months compared to 53% of patients with no brain

metastasis at the time of diagnosis alive 48 months after diagnosis. *Id.* He found

that Plaintiff could have lived an additional 12 to 36 months if no brain metastasis

was present in November of 2018 and an additional 9 to 12 months if it was

present at that time. *Id*. As such, Dr. Pachynski opined that "given the totality of

the circumstances, more likely than not, the delay in diagnosis and treatment of the

patient's metastatic RCC would have led to a decrease in his overall survival." *Id*.

at PageID.386-87.

Dr. Pachynski was deposed on August 2, 2022.  At his deposition, he

testified that it was more probable than not that the brain metastasis was not

present in November of 2018.  ECF No. 40, PageID.411.  He further testified that

he could not be certain whether micro metastatic disease was present in November

of 2018.  *Id*. He testified there was a likelihood and "that's certainly probable that

[Plaintiff] had metastatic disease at that point." *Id*.  He indicated micro metastatic

disease is present in many cancer patients, however the disease is not detectable by

imaging. *Id*. at PageID.411-412.

Dr. Pachynski further opined Plaintiff's treatment in 2019 would not have

included radiation for the brain tumor if the metastasis had not been present in

November of 2018 and Plaintiff's RCC was promptly discovered.  *Id*. at

PageID.413.  However, the systemic treatment (chemotherapy) would have been

the same—the targeted cabozantinib followed by the immunotherapies ipilimumab

and nivolumab.  *Id*.

### III.   LAW & ANALYSIS

#### A.  **Standard of Review**

Federal Rule of Civil Procedure 56(a) "directs that summary judgment shall

be granted if there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law." *Cehrs v. Ne. Ohio Alzheimer's*

*Research Ctr*., 155 F.3d 775, 779 (6th Cir. 1998) (quotations omitted). The court

must view the facts, and draw reasonable inferences from those facts, in the light

most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). No genuine dispute of material

fact exists where the record "taken as a whole could not lead a rational trier of fact

to find for the non-moving party." *Matsushita Elec. Indus., Co. v. Zenith Radio*

*Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Ultimately, the

court evaluates "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

B. **Defendants' Motion for Summary Judgment**

To establish a cause of action for medical malpractice, a plaintiff must

establish four elements: (1) the appropriate standard of care governing the

defendant's conduct at the time of the purported negligence, (2) that the defendant

breached that standard of care, (3) that the plaintiff was injured, and (4) proximate

cause between the plaintiff's injuries and the defendant's breach of the applicable

standard of care.  *Kalaj v. Khan*, 295 Mich. App. 420, 429; 820 N.W.2d 223

(2012).  Michigan Compiled Laws § 600.2912a(2) governs the proximate

causation requirement for medical malpractice actions and states:

> In an action alleging medical malpractice, the plaintiff has the burden
> of proving that he or she suffered an injury that more probably than
> not was proximately caused by the negligence of the defendant or
> defendants. In an action alleging medical malpractice, the plaintiff
> cannot recover for loss of an opportunity to survive or an opportunity
> to achieve a better result unless the opportunity was greater than 50%.

MICH. COMP. LAWS § 600.2912a(2).  The first sentence encompasses traditional

medical malpractice claims and "merely reiterates the longstanding rule requiring a

plaintiff to prove that he or she suffered an injury that more probably than not was

proximately caused by the negligence of the defendant or defendants."  *O'Neal v.*

*St. John Hosp. & Med. Ctr.*, 487 Mich. 485, 495; 791 N.W.2d 853 (2010) (internal

quotation marks and citation omitted).  The second sentence of § 2912a(2)

concerns "a subcategory of injuries in medical malpractice litigation governed by

the loss-of-opportunity doctrine." *Id*.  The second sentence of the statute does not

apply to traditional medical malpractice cases.  *Id*. at 498.

### 1.  Loss of Opportunity

Defendants argue this is a lost opportunity case relying on the Complaint's

allegations and Plaintiff's expert, Dr. Pachynski's, opinion that the seven-month

delay in diagnosing Plaintiff's RCC reduced Plaintiff's lifespan by 12 to 36 months

if brain metastasis was not present in November of 2018, or by 9 to 12 months if

the brain metastasis was already present.  In the Complaint, Plaintiff alleged the

Defendants breached the duty of care and a proximate cause of the failure to timely

diagnose Plaintiff's RCC is "a materially reduced life expectancy over what it

would, more likely than not, have been with prompt diagnosis."  ECF No. 1,

PageID.4.  Because this is a lost opportunity case, Defendants argue *Wickens,*

*supra*, precludes Plaintiffs' claim.

Defendants are correct that, to the extent Plaintiffs seek to recover for loss

based on the delay in diagnosis which reduced Plaintiff Craig Beaubien's lifespan

or chance for a better outcome, this aspect of his claim is foreclosed by *Wickens.*

*See Wickens.*, 465 Mich. at 62.  In *Wickens*, the plaintiff alleged a one-year delay

in diagnosing her breast cancer caused her to suffer a poorer prognosis of long-

term survival and a reduction in the quality of life and life expectancy.  *Id*. at 56.

The Michigan Supreme Court found that "[t]he testimony that plaintiff's chances

of surviving for a ten-year period decreased, however, is evidence of a potential future injury-death-which is not an injury *already suffered*, as required by the plain language of the statute." *Id*. at 60-61 (emphasis in original).

Therefore, the *Wickens* court held "a loss of an opportunity to survive claim . . . limits recovery to situations where death has already occurred." *Id.* However, *Wickens* allowed recovery for injuries already suffered as a result of the delay in diagnosis, such as injuries related to (1) more invasive medical treatments caused by the delay in diagnosis, (2) the emotional trauma attributable to unnecessarily worsened physical condition, and (3) the pain and suffering attributable to a worsened physical condition. Indeed, the *Wickens* court concluded the trial court erred in dismissing the entire suit on the basis of subsection § 2912a(2).

Plaintiffs respond that this case is distinguishable from the circumstances present in *Wickens* because the plaintiff in that case had recovered from her disease, thus her claim was predicated upon an increased possibility that she would have a recurrence of her cancer. On the other hand, Plaintiff Craig Beaubien's cancer is terminal. Plaintiffs' attempt to distinguish this case from *Wickens* is not well taken. Plaintiffs have not cited any case authority permitting a living plaintiff to recover damages for reduced life expectancy. Plaintiffs are asking the Court to carve out an exception to the general rule that a living plaintiff cannot recover for a

reduced lifespan for health conditions that are terminal.  There is no support in the case law or statutory text for such an exception.

Therefore, to the extent Plaintiffs seek to recover for Plaintiff Craig Beaubien's loss of opportunity for a better outcome or his reduced lifespan, *Wilkins* bars his claim.  This aspect of Defendants' Motion for Summary Judgment is granted.

## 2.   Other Injury as a Result of Delayed Diagnosis

Defendants acknowledge that *Wickens* does not foreclose recovery for injuries already suffered, however, they maintain the delay in diagnosis of RCC did not cause Plaintiff Craig Beaubien to suffer any of the injuries delineated by the *Wickens*' court.  Defendants assert that Dr. Pachysnki's report centers on one opinion.  Specifically, "[i]n my opinion, given the totality of the data, more likely than not, the delay in diagnosis and treatment of the patient's metastatic RCC (renal cell carcinoma) would have led to a decrease in his overall survival." Defendants further assert that whether the brain tumor was present in November of 2018 is only relevant to Dr. Pachynski's findings concerning its effect on estimated survival.

Defendants also acknowledge that Dr. Pachynski testified in his opinion it "was more probable than not" the brain tumor was not present at the time Plaintiff first began treatment with Defendant Trivedi.  However, Defendants point out that

Dr. Pachynksi cannot rule out that micro metastatic disease in the brain may have been present in November of 2018. Therefore, Defendants argue Plaintiff cannot demonstrate he could have avoided treatment of his brain tumor with earlier diagnosis.

Contrary to Defendants' argument, there is sufficient evidence in the record to survive summary judgment as to Plaintiffs' claim that he suffered excruciating headaches, mental distress, anguish and loss of earnings as a result of the delay in diagnosis.  Dr. Pachynksi testified that Plaintiff would not have had to undergo the radiation treatment if Dr. Trivedi had ordered imaging because it is more probable than not that the brain tumor developed during the seven-month delay.  Plaintiff also testified that he developed an excruciating headache from the brain tumor causing him to seek treatment in June of 2019.  While Defendants make much of the fact Dr. Pachynksi conceded micro metastatic disease was likely present in November 2018, this does not mean Plaintiffs cannot establish the delay in diagnosis was a proximate cause of Plaintiff's injuries, including his excruciating headache pain, mental distress, anguish, loss of earnings, and radiation treatment and surgery he may not have otherwise needed had Dr. Trivedi ordered the appropriate imaging studies in November of 2018.  A jury may conclude Defendants' negligence in failing to order imaging was a proximate cause of

Plaintiff Craig Beaubien developing brain metastasis requiring radiation treatment and causing him to suffer pain, anguish and loss of earnings.

## IV.    CONCLUSION

Accordingly, for the reasons articulated above, Defendants' Motion for Summary Judgment [#40] is GRANTED IN PART and DENIED IN PART.

## V.    AMENDED SCHEDULE

| YOU WILL RECEIVE NO FURTHER NOTICE OF THESE DATES | |
| --- | --- |
| Facilitation: | No later than May 31, 2023 |
| Proposed Order of Facilitation (must include identity of the Facilitator and date of Facilitation): | March 24, 2023 |
| Motions in Limine due: | June 28, 2023 |
| Final Pretrial Order due: | June 28, 2023 |
| Final Pretrial Conference: | July 25, 2023 at 2:00 p.m. |
| Trial: | August 15, 2023 at 9:00 a.m. |
| Estimated Length of Trial: | 1-2 weeks |

The policies and procedures set forth in the Court's Second Amended Scheduling Order (ECF No. 31) remain in effect.

SO ORDERED.

Dated:  March 14, 2023                         /s/Gershwin A. Drain
                                               GERSHWIN A. DRAIN
                                               United States District Judge